IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK



_____

UNITED STATES OF AMERICA,

        v.

24-CR-6043 ~~CJS~~

TIMOTHY SIVERD,

        Defendant.

_____

## PLEA AGREEMENT

The defendant, TIMOTHY SIVERD, and the United States Attorney for the Western District of New York (hereinafter "the government") hereby enter into a plea agreement with the terms and conditions as set out below.

## I.    THE PLEA AND POSSIBLE SENTENCE

1.    The defendant agrees to waive indictment and to plead guilty to a one count Information that charges a violation of Title 18, United States Code, Section 1343 (Wire Fraud), for which the maximum possible sentence is a term of imprisonment of 20 years, a fine of $250,000 or twice the gross pecuniary gain or loss, whichever is greater, a mandatory $100 special assessment, and a term of supervised release of 3 years. The defendant understands that the penalties set forth in this paragraph are the maximum penalties that can be imposed by the Court at sentencing.

2.    The defendant understands that, if it is determined that the defendant has violated any of the terms or conditions of supervised release, the defendant may be required to serve in prison all or part of the term of supervised release, up to 2 years, without credit for

time previously served on supervised release.  As a consequence, a prison term imposed for a violation of supervised release may result in the defendant serving a sentence of imprisonment longer than the statutory maximum set forth in ¶ 1 of this agreement.

## II.    ELEMENTS AND FACTUAL BASIS

3.    The defendant understands the nature of the offense set forth in ¶ 1 of this agreement and understands that if this case proceeded to trial, the government would be required to prove beyond a reasonable doubt the following elements of the crime:

a.  First, that there was a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises;

b.  Second, that the defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and

c.  Third, that in execution of that scheme, the defendant used or caused the use of interstate wires.

## FACTUAL BASIS

4.    The defendant and the government agree to the following facts, which form the basis for the entry of the plea of guilty including relevant conduct:

a.    Between 2021 and 2022, the defendant, TIMOTHY SIVERD, executed a scheme and artifice to defraud and obtain money and property from Victim 1 and Victim 2 using materially false and fraudulent representations and promises.

b.    As part of this scheme and artifice, SIVERD made the following misrepresentations:

2

*Victim 1*

*Transaction #1 – Real Estate Purchase*

c.   In or around November 2021, SIVERD approached Victim 1 and claimed that he had an opportunity to start building a joint real estate portfolio by investing in a group of five residential duplexes located in Rochester, New York.

d.   On or about November 12, 2021, Victim 1 made an initial down payment on the investment by paying $12,500.00 into SIVERD's ESL Checking Account X0297.

e.   That same day, SIVERD withdrew $10,750 of Victim 1's funds from ESL Checking Account X0297 in cash.

f.   On or about November 22, 2021, Victim 1 made a second deposit of $12,500 into J.P. Morgan Chase ("JPMC") Checking Account X6508, which belonged to SIVERD and his wife.

g.   The following day, on or about November 23, 2021, SIVERD made a cash withdrawal of $12,200 from the JPMC account X6508.

h.   Contrary to his representations to Victim 1, SIVERD never used any of Victim 1's funds to invest in real estate.  Instead, SIVERD applied these funds to his own personal use.

*Transaction #2 – Tompkins Line of Credit*

i.   In or around December 2021, SIVERD invited Victim 1 to open a savings account at Tompkins Bank of Castile.

j.   On or about December 6, 2021, Victim 1 transferred $10,000 to SIVERD's ESL Account x0297.  SIVERD falsely represented to Victim 1 that SIVERD was going to use this money open an investment account at Tompkins Bank of Castile on Victim 1's behalf.

k.   That same day, SIVERD withdrew the full $10,000 in cash.

l.   Contrary to his representations to Victim 1, SIVERD never used any of Victim 1's funds to open a savings account on Victim 1's behalf.  Instead, SIVERD applied these funds to his own personal use.

*Transaction #3 - The Carriages at Cedar Rock*

m.   In or around December 2021, SIVERD represented to Victim 1 that he had an acquaintance named "P.S." who was consulting for Canandaigua National Bank ("CNB") and therefore was able to purchase foreclosed properties from CNB at below market prices.

3

n.  SIVERD also falsely represented to Victim 1 that CNB owned a complex of townhomes located at 722-733 Cedar Rock Road in Webster, New York, known as "The Carriages at Cedar Rock" (hereinafter "The Carriages") and that CNB wanted to sell the Carriages to "P.S." before the end of 2021.

o.  Contrary to what SIVERD represented to Victim 1, CNB never owned The Carriages.

p.  SIVERD proposed that "P.S.," SIVERD, and Victim 1 form a limited liability company—Sumner Capital, LLC—to purchase The Carriages.

q.  SIVERD falsely represented to Victim 1 that CNB required an immediate deposit of $150,000. SIVERD asked Victim 1 to pay $25,000 towards the deposit as soon as possible.

r.  On or about December 15, 2021, Victim 1 paid $25,000 into SIVERD's ESL Account X0297.

s.  That same day, SIVERD withdrew $24,975 from ESL Account X0297 in four separate transactions: a $10,000 cash withdrawal; a $5,000 cash withdrawal; a $9,500 cashier's check to his wife; and a $475 internet transfer to another ESL account. SIVERD did not transfer Victim 1's deposit to an escrow account or to CNB.

t.  SIVERD then falsely represented to Victim 1 that Tompkins bank of Castile (where SIVERD was then employed as a Vice President) agreed to loan Sumner Capital, LLC, the funds necessary to complete the purchase of The Carriages.

u.  SIVERD presented Victim 1 with a fraudulent loan commitment letter, dated January 9, 2022, on Tompkins Community Bank letterhead. The commitment letter falsely indicated that Tompkins had approved a loan for 85% of the appraised value of The Carriages property. The alleged loan was contingent upon Tompkins Community Bank receiving a $22,500 commitment fee, which was due upon acceptance of the commitment letter.

v.  The loan commitment letter appeared to be signed by "S.P.", Senior Vice President, The Bank of Castile. SIVERD forged S.P.'s signature on the letter.

w.  As a result of SIVERD's false representations, Victim 1 agreed to pay approximately half of the loan commitment fee and, on or about January 3, 2022, Victim 1 wired $12,500 to SIVERD's ESL Account X0297. SIVERD withdrew $12,300 in cash from his account that same day.

x.  SIVERD also presented Victim 1 with a fraudulent Real Estate Purchase Contract for The Carriages transaction.

4

y.  The Purchase Contract falsely indicated that CNB would sell The Carriages to Sumner Capital, LLC, for a purchase price of $2,550,000. The scheduled closing date was March 1, 2022.

z.  The Purchase Contract purported to be signed by "C.V." on behalf of CNB. SIVERD forged C.V.'s signature on the fraudulent Purchase Contract.

aa.  On or about January 18, 2022, Victim 1 executed the fraudulent Purchase Contract.

bb.  At some point while the transaction was still being negotiated, SIVERD falsely represented to Victim 1 that there was a mechanic's lien on The Carriages that needed to be paid before the transaction could close.

cc.  On or about January 19, 2022, Victim 1 paid $10,929 to SIVERD's ESL Account X0297. SIVERD immediately withdrew the funds, performing a withdrawal of $10,500 as well as initiated a transfer in the amount of $425 to his Robinhood investment account.

dd.  Contrary to his representations to Victim 1, SIVERD never used any of Victim 1's funds to invest in The Carriages or any other real estate. Instead, SIVERD applied these funds to his own personal use.

*Transaction #4 – Keuka Lake House*

ee.  In or around December 2021, SIVERD also falsely represented to Victim 1 that he was able to purchase a property on Keuka Lake.

ff.  Victim 1 agreed to purchase the lake house with SIVERD and, on or about February 9, 2022, Victim 1 wired $40,000 to SIVERD's ESL Account X0297.

gg.  That same day, SIVERD issued a $40,000 cashier's check from his ESL Account X0297 payable to A.C.

hh.  Contrary to his representations to Victim 1, SIVERD never used any of Victim 1's funds to invest in property on Keuka Lake or any other real estate. Instead, SIVERD applied these funds to his own personal use.

*Transaction #5 – Creek Crossing*

ii.  In or around January 2022, SIVERD falsely represented to Victim 1 that Tompkins owned a townhouse development located at 2A Marple Lane in Hilton, New York, which was known as "Creek Crossing Townhomes" (hereinafter "Creek Crossing").

jj.  Contrary to what SIVERD represented to Victim 1, Tompkins never owned Creek Crossing.

kk.    Around this time, SIVERD told Victim 1 that "P.S." had been diagnosed with cancer and no longer wanted to proceed with The Carriages transaction.

ll.    SIVERD and Victim 1 agreed to proceed with The Carriages and Creek Crossings transactions as partners through a newly-formed limited liability company—Sumner Capital II, LLC.

mm.    On or about January 27, 2022, SIVERD provided Victim 1 with a fraudulent Real Estate Purchase Agreement, which falsely represented that "Tompkins Financial Corporation" agreed to sell Creek Crossing to Sumner Capital II, LLC, for a total price of $1,999,000. The fraudulent Purchase Agreement also falsely indicated that the buyer, Sumner Capital II, LLC (i.e., SIVERD and Victim 1) owed a down payment of $70,000 upon execution of the Purchase Agreement. The down payment was supposed to be held by an escrow agent, First American Title Insurance Company.

nn.    The fraudulent Purchase Agreement appeared to be signed by "T.S." on behalf of "Tompkins Financial Corporation." SIVERD forged this signature on the fraudulent Purchase Agreement.

oo.    On or about January 27, 2022, SIVERD and Victim 1 counter-signed the Purchase Agreement. Upon signing the Purchase Agreement, Victim 1 wired half of what he was incorrectly led to believe was the required down payment ($35,000) to SIVERD's ESL Account X0297.

pp.    In return, SIVERD sent Victim 1 a fraudulent Receipt that purported to acknowledge First American Title Insurance Company's receipt of the full $70,000 down payment. The receipt appeared to be signed by "J.K." on behalf of First American Title Insurance Company. SIVERD forged this signature on the Receipt.

qq.    The same day he received the $35,000 wire from Victim 1, SIVERD made a series of withdrawals from the ESL Account X0297 totaling $34,750: a cash withdrawal of $9,000; a cashier's check to CAMACHO for $16,000; and a wire transfer of $9,750 to the JPMorgan Chase Bank account he shares with his wife.

rr.    Contrary to his representations to Victim 1, SIVERD never used any of Victim 1's funds to invest in Creek Crossing or any other real estate. Instead, SIVERD applied these funds to his own personal use.

ss.    In total, Victim 1 paid SIVERD approximately $158,429 based on SIVERD's false representations that SIVERD was investing all these funds in various real estate and financial transactions.

***Victim 2***

***Transaction #6 – Greenwood Townhomes***

tt.    In or around January 2022, SIVERD falsely represented to Victim 2 that "P.S." owned 31 Mulcahy Blvd, Phase I in Rochester, New York, known as "Greenwood Townhomes" (hereinafter "Greenwood Townhomes") and wanted to sell the property.

uu.    Contrary to SIVERD's representations, P.S. never owned Greenwood Townhomes.

vv.    SIVERD falsely represented to Victim 2 that the two of them would use a limited liability company named Sumner Capital, LLC, to purchase Greenwood Townhomes. SIVERD falsely represented that he would one own half of Sumner Capital, LLC, and Victim 2 would own the other half.

ww.    On or about February 23, 2022, Victim 2 paid $50,000 to SIVERD's ESL Account X0297. That same day, SIVERD transferred $45,000 of Victim 2's funds to A.C.'s ESL Account x4767. Days later, SIVERD transferred $4,500 to his own Robinhood investment account.

xx.    On or about March 15, 2022, at SIVERD's insistence, SIVERD and Victim 2 executed a Promissory Note to memorialize Victim 2's payment of $50,000 to SIVERD "to make an investment into the acquisition of Greenwood Townhomes."

yy.    Subsequently, SIVERD falsely represented to Victim 2 that they needed additional funds to pay the closing costs associated with the Greenwood Townhomes transaction.

zz.    On or about March 16, 2022, Victim 2 wrote SIVERD a check for $6,226.55.

aaa.    On or about March 21, 2022, SIVERD deposited the $6,226.55 check from Victim 2 into SIVERD's JPMC Account X6508.

bbb.    On or about March 24, 2022, Victim 2 paid another $77,500 towards the purchase of Greenwood Townhomes to SIVERD's ESL Account X0297. That day, SIVERD withdrew the entire payment from his ESL account in four separate transactions: a $56,800 transfer to A.C.; a $6,500 transfer to SIVERD's mother; a $2,000 transfer to SIVERD's Robinhood Account; and a $12,185 transfer to an E*TRADE brokerage account.

7

ccc.  On or about April 1, 2022, Victim 2 made a fourth payment towards the Greenwood Townhomes purchase by wiring $32,715 to SIVERD's JPMC Account X6508. Over the following weeks, SIVERD spent Victim 2's money on various personal transactions at gas stations, grocery stores, and other assorted retailers. SIVERD also used Victim 2's money to engage in online gambling.

ddd.  On or about April 4, 2022, Victim 2 made a fifth and final payment toward the Greenwood Townhomes transaction of $2,750. SIVERD falsely represented that these funds were for attorneys' fees.

eee.  Instead, SIVERD deposited Victim 2's check into SIVERD's JPMC Account X6508 and spent the funds on personal expenses and online gambling.

fff.  Contrary to his representations to Victim 2, SIVERD never used any of Victim 2's funds to invest in Greenwood Townhomes or any other real estate. Instead, SIVERD applied these funds to his own personal use.

*Transaction #7 – Company LC*

ggg.  In or around February 2022, SIVERD represented to Victim 2 that SIVERD and several other investors were forming Turkey Ridge Capital Partners LLC to purchase shares of a company ("Company LC").

hhh.  SIVERD provided Victim 2 with a draft Operating Agreement for Turkey Ridge Capital Partners LLC. The draft Operating Agreement represented that the purpose of Turkey Ridge Capital Partners LLC was "solely to hold a membership interest in [Company LC]." The draft Operating Agreement also represented that Turkey Ridge Capital Partners LLC would have 16 members and that each member would make an initial capital commitment.

iii.  SIVERD represented to Victim 2 that SIVERD was also going to make capital commitments to Turkey Ridge Capital Partners LLC.

jjj.  On or about March 14, 2022, Victim 2 transferred $52,200 into SIVERD's ESL Checking Account x0297 for the purpose of making an initial capital contribution in Turkey Ridge Capital Partners LLC.

kkk.  On or about March 15, 2022, SIVERD and Victim 2 executed a second Promissory Note, in which SIVERD fraudulently represented that Victim 2's payment to SIVERD of $52,500 would be used to "make an investment into the acquisition of [Company LC]."

lll.    On or about March 14, 2022, SIVERD made two transfers of $43,000 and $2,400, respectively, to A.C.'s ESL Account X4767.

mmm.  Contrary to his representations to Victim 2, SIVERD never used any of Victim 2's funds to invest in Turkey Ridge Capital Partners LLC, Company LC, or any other real estate or financial assets.  Instead, SIVERD applied these funds to his own personal use.

### Transaction #8 - Personal Loan

nnn.    In or around March 2022, SIVERD represented to Victim 2 that he had cash flow troubles and asked Victim 2 for a short-term loan.

ooo.    Victim 2 agreed to loan SIVERD $25,000.

ppp.    On or about March 31, 2022, SIVERD executed a promissory note memorializing the terms of the personal loan.  The note required SIVERD to repay the $25,000 within 30 days.

qqq.    On or about April 4, 2022, SIVERD deposited a $25,000 check from Victim 2 into his JPMC Account X6508.

rrr.    SIVERD never intended to repay Victim 2 for the personal loan.

### Transaction #7 – Dunwood Green Apartments

sss.    In or around April 2022, SIVERD falsely represented to Victim 2 that they had an opportunity to purchase known as "Dunwood Green Apartments" (hereinafter "Dunwood Green Apartments").

ttt.    On or about April 14, 2022, Victim 2 mailed a check for $100,000 to SIVERD to investment in Dunwood Green Apartments.

uuu.    On or about April 18, 2022, the $100,000 check was deposited into SIVERD's JPMC Account X6508.  SIVERD then spent this money on personal expenses, online gambling, the purchase of a golf simulator, a $25,000 wire to Victim 1, and a $60,000 withdrawal.

vvv.    Contrary to his representations to Victim 2, SIVERD never used any of Victim 2's funds to invest in Dunwood Green Apartments or any other real estate. Instead, SIVERD applied these funds to his own personal use.

www.  In total, Victim 2 paid SIVERD $346,511.55 believing that these funds would be invested in various real estate and financial transactions.

xxx.    In the execution of this scheme and artifice, SIVERD made and caused wire transfers of funds from Victim 1 and Victim 2 to SIVERD and from SIVERD to other accounts in his name or under his control. The parties agree that each wire transfer from Victim 1 and Victim 2 to SIVERD constituted an interstate wire.

yyy.    In the execution of this scheme and artifice, SIVERD, who was located in the Western District of New York, also used email and the telephone to make fraudulent representations to Victim 1 and Victim 2, both of whom were located outside of the State of New York. The parties agree that each of these electronic and telephonic communications also constituted an interstate wire.

### III.    SENTENCING GUIDELINES

5.    The defendant understands that the Court must consider but is not bound by the Sentencing Guidelines (Sentencing Reform Act of 1984).

### BASE OFFENSE LEVEL

6.    The government and the defendant agree that Guidelines § 2B1.1(a)(1) applies to the offense of conviction and provides for a base offense level of 7.

### SPECIFIC OFFENSE CHARACTERISTICS
### U.S.S.G. CHAPTER 2 ADJUSTMENTS

7.    The government and the defendant agree that the following specific offense characteristic does apply:

a.    The 12-level increase pursuant to Guidelines § 2B1.1(b)(1)(G)(the total loss including relevant conduct, namely $504,940.55, was in excess of $250,000 but not more than $550,000).

## U.S.S.G. CHAPTER 3 ADJUSTMENTS

8.      The government and the defendant agree that the following adjustment to the base offense level does apply:

a.      The two-level increase of Guidelines § 3B1.3 (abuse of trust/special skill).

### ADJUSTED OFFENSE LEVEL

9.      Based on the foregoing, it is the understanding of the government and the defendant that the adjusted offense level for the offense of conviction is 21.

### ACCEPTANCE OF RESPONSIBILITY

10.      At sentencing, the government agrees not to oppose the recommendation that the Court apply the two (2) level decrease of Guidelines § 3E1.1(a) (acceptance of responsibility) and further agrees to move the Court to apply the additional one (1) level decrease of Guidelines § 3E1.1(b), which would result in a total offense level of 18.

### CRIMINAL HISTORY CATEGORY

11.      It is the understanding of the government and the defendant that the defendant's criminal history category is I.  The defendant understands that if the defendant is sentenced for, or convicted of, any other charges prior to sentencing in this action the defendant's criminal history category may increase.  The defendant understands that the defendant has no right to withdraw the plea of guilty based on the Court's determination of the defendant's criminal history category.

## ADJUSTMENT FOR ZERO-POINT OFFENDER

12.     It is the understanding of the government and the defendant that the defendant meets the criteria set forth in Guidelines Section 4C1.1(a)(1) – (10) (Adjustment for Certain Zero-Point Offenders), and as a result, a two-level downward adjustment applies, and the adjusted offense level is 16.

## GUIDELINES' APPLICATION, CALCULATIONS AND IMPACT

13.     It is the understanding of the government and the defendant that, with a total offense level of 16 and criminal history category of I, the defendant's sentencing range would be **a term of imprisonment of 21 to 27 months, a fine of $10,000 to $95,000, and a period of supervised release of 1 to 3 years**.  Notwithstanding this, the defendant understands that at sentencing the defendant is subject to the maximum penalties set forth in ¶ 1 of this agreement.

14.     The government and the defendant agree to the correctness of the calculation of the Sentencing Guidelines range set forth above.  The government and the defendant, however, reserve the right to recommend a sentence outside the Sentencing Guidelines range. This paragraph reserves the right to the government and the defendant to bring to the attention of the Court all information deemed relevant to a determination of the proper sentence in this action.

15.     The defendant understands that the Court is not bound to accept any Sentencing Guidelines calculations set forth in this agreement and the defendant will not be entitled to withdraw the plea of guilty based on the sentence imposed by the Court.

16.     In the event the Court contemplates any Guidelines adjustments, departures, or calculations different from those agreed to by the parties above, the parties reserve the right to answer any inquiries by the Court concerning the same.

## IV.    STATUTE OF LIMITATIONS

17.     In the event the defendant's plea of guilty is withdrawn, or conviction vacated, either pre- or post-sentence, by way of appeal, motion, post-conviction proceeding, collateral attack or otherwise, the defendant agrees that any charges dismissed pursuant to this agreement shall be automatically reinstated upon motion of the government and further agrees not to assert the statute of limitations as a defense to any federal criminal offense which is not time barred as of the date of this agreement. This waiver shall be effective for a period of six months following the date upon which the withdrawal of the guilty plea or vacating of the conviction becomes final.

## V.    REMOVAL

18.     The defendant represents that he is a citizen of the United States. However, if the defendant is not a citizen of the United States, the defendant understands that, if convicted, the defendant may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## VI.    GOVERNMENT RIGHTS AND OBLIGATIONS

19.     The defendant understands that the government has reserved the right to:

a.   provide to the Probation Office and the Court all the information and evidence in its possession that the government deems relevant concerning the defendant's background, character and involvement in the offense charged, the circumstances surrounding the charge and the defendant's criminal history;

b.   respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government;

c.   advocate for a specific sentence consistent with the terms of this agreement including the amount of restitution and/or a fine and the method of payment;

d.   modify its position with respect to any sentencing recommendation or sentencing factor under the Guidelines including criminal history category, in the event that subsequent to this agreement the government receives previously unknown information, including conduct and statements by the defendant subsequent to this agreement, regarding the recommendation or factor; and

e.   oppose any application for a downward departure and/or sentence outside the Guidelines range made by the defendant.

20.   At sentencing, the government will move to dismiss the Criminal Complaint pending against the defendant under Magistrate's No. 22-mj-689.

21.   The defendant agrees that any financial records and information provided by the defendant to the Probation Office, before or after sentencing, may be disclosed to the United States Attorney's Office for use in the collection of any unpaid financial obligation.

14

## VII.   RESTITUTION AND FINANCIAL PENALTY PROVISIONS

22.    The defendant understands, and the parties agree, that the offense of conviction is an offense listed under 18 U.S.C. § 3663A(c)(1), and therefore the Court must require restitution in the following amounts as part of the sentence pursuant to Sentencing Guidelines § 5E1.1 and Title 18, United States Code, Section 3663A:

| | |
|---|---|
| Victim 1 | $50,000 |
| Victim 2 | $346,511.11 |
| **Total** | **$396,511.11** |

23.    The defendant understands that defendant will not be entitled to withdraw the plea of guilty based upon any restitution amount ordered by the Court.

24.    The defendant agrees that the defendant will not oppose bifurcation of the sentencing hearing under 18 U.S.C. § 3664(d)(5) if the victims' losses are not ascertainable prior to sentencing.

25.    The defendant agrees to disclose fully and completely all assets in which the defendant either has any property interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.  The defendant agrees to make complete financial disclosure to the United States by truthfully executing a sworn financial statement by the deadline set by the United States, or if no deadline is set, no later than two weeks prior to the date of sentencing.  The defendant agrees to authorize the release of all financial information requested by the United States, including,

15

but not limited to, executing authorization forms for the United States to obtain tax information, bank account records, credit history, and social security information. The defendant agrees to discuss or answer any questions by the United States relating to the defendant's complete financial disclosure. The defendant will submit to an examination under oath and/or a polygraph examination conducted by an examiner selected by the U.S. Attorney's Office on the issue of the defendant's financial disclosures and assets, if deemed necessary by the U.S. Attorney's Office. The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by the agreement and/or that may be imposed upon the defendant by the Court. In addition, the defendant promises that the defendant will make no such transfers in the future.

26.     The defendant understands and agrees that the Court, at the time of sentencing, will order that all monetary penalties imposed at that time (including any fine, restitution, or special assessment imposed in accordance with the terms and conditions of this plea agreement) are to be due and payable in full immediately and will be (i) subject to immediate enforcement as provided for in 18 U.S.C. § 3613, and (ii) submitted to the Treasury Offset Program (TOP) so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts but will not affect any periodic payment schedule set by the Court.

27.     Under the TOP program, the Department of the Treasury will reduce or withhold any of the defendant's eligible Federal payments by the amount of the defendant's debt. This "offset" process is authorized by the Debt Collection Act of 1982, as amended by the Debt Collection Improvement Act of 1996 and the Internal Revenue Code. The

government hereby provides the defendant with notice that 60 days after sentencing, unless the monetary judgment(s) ordered by the Court is paid in full immediately after sentencing, the government will refer the outstanding monetary judgment to TOP for the offset of any pending federal payments, and the defendant agrees not to object or contest any such action by the government and waives any further notice.

28.     The defendant understands and acknowledges that any schedule of payments imposed by the Court at the time of sentencing is merely a minimum schedule of payments and does not, in any way, limit those methods available to the United States to enforce the judgment.   Further, the defendant agrees not to challenge or dispute any efforts by the government to enforce collection of any monetary penalties ordered by the Court.

29.     The defendant understands and agrees that under Title 18, United States Code, Section 3664(m), the government may use all available and reasonable means to collect restitution, and pursuant to Title 18, United States Code, Section 3664(n), if the defendant is ordered to pay restitution, or pay a fine, receives substantial resources from any source, including inheritance, settlement, or other judgment, during a period of incarceration, the defendant shall be required to apply the value of such resources to any restitution or fine still owed without objection.

30.     The defendant agrees that any funds and assets in which the defendant has an interest, which have been seized or restrained by the government or law enforcement as part of the investigation underlying this plea agreement, and not subject to forfeiture, will be used to offset any judgment of restitution and fine imposed pursuant to this plea agreement, or to satisfy any debts owed by the defendant to the United States and/or agencies thereof.

31.     To the extent that the defendant has an interest, the defendant authorizes the District Court Clerk to release any funds posted as security for the defendant's appearance bond in this case, which funds shall be applied to satisfy the financial obligation(s) of the defendant pursuant to the judgment of the Court.

32.     The defendant is aware that voluntary payment of restitution prior to adjudication of guilt is a factor in considering whether the defendant has accepted responsibility under the United States Sentencing Guidelines §3E1.1.

## VIII.  APPEAL RIGHTS

33.     The defendant understands that Title 18, United States Code, Section 3742 affords a defendant a limited right to appeal the sentence imposed.  The defendant, however, knowingly waives the right to appeal and collaterally attack any component of a sentence imposed by the Court which falls within or is less than **a term of imprisonment of 21 to 27 months, a fine of $10,000 to $95,000, and a period of supervised release of 1 to 3 years**, notwithstanding the manner in which the Court determines the sentence.  In the event of an appeal of the defendant's sentence by the government, the defendant reserves the right to argue the correctness of the defendant's sentence.  The defendant further agrees not to appeal a restitution order which does not exceed the amount set forth in Section VII of this agreement.

34.     The defendant understands that by agreeing not to collaterally attack the sentence, the defendant is waiving the right to challenge the sentence in the event that in the future the defendant becomes aware of previously unknown facts or a change in the law which the defendant believes would justify a decrease in the defendant's sentence.

35.    The government waives its right to appeal any component of a sentence imposed by the Court which falls within or is greater than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 13, above, **a term of imprisonment of 21 to 27 months, a fine of $10,000 to $95,000, and a period of supervised release of 1 to 3 years,** notwithstanding the manner in which the Court determines the sentence.  However, in the event of an appeal from the defendant's sentence by the defendant, the government reserves its right to argue the correctness of the defendant's sentence.

## IX.    TOTAL AGREEMENT AND AFFIRMATIONS

36.    This plea agreement represents the total agreement between the defendant, **TIMOTHY SIVERD**, and the government.  There are no promises made by anyone other than those contained in this agreement.  This agreement supersedes any other prior agreements, written or oral, entered into between the government and the defendant.

TRINI E. ROSS
United States Attorney
Western District of New York

BY: _____

NICHOLAS M. TESTANI
Assistant United States Attorney

Dated:  April 29 , 2024

I have read this agreement, which consists of pages 1 through 20. I have had a full opportunity to discuss this agreement with my attorney, Donald M. Thompson, Esq. I agree that it represents the total agreement reached between me and the government. No promises or representations have been made to me other than what is contained in this agreement. I understand all of the consequences of my plea of guilty. I fully agree with the contents of this agreement. I am signing this agreement voluntarily and of my own free will.

_____
Timothy Siverd
Defendant

Dated: April 29, 2024

_____
Donald M. Thompson, Esq.
Attorney for the Defendant

Dated: April 29, 2024